**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAWNYA LYNN DONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-775 |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MEMORANDUM OPINION

## I.    INTRODUCTION

Tawnya Lynn Donley ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-403, 1381-1383f ("Act").  This matter comes before the Court on cross motions for summary judgment.  (Docket Nos. 8, 12).  For the following reasons, Plaintiff's Motion for Summary Judgment [8] is denied and Defendant's Motion for Summary Judgment [12] is granted.

## II.    PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on May 20, 2010.  (R. at 39).[1]  Plaintiff's alleged disability onset date was initially February 10, 2010.  (R. at 149).  During a hearing before the Administrative Law Judge ("ALJ") on October 27, 2011, Plaintiff amended her disability onset

---

[1]    Citations to Docket Nos. 6 - 1: 6 - 10, the Record, *hereinafter*, "R. at _."

date to November 1, 2010. (R. at 41, 37). At the outset, Plaintiff claimed disability from work due to arthritis in her back which affected her hips and legs. (R. at 49, 147).

The Social Security Administration ("SSA") informed Plaintiff in separate letters dated December 12, 2010 that she did not qualify for DIB or SSI. (R. at 90). Plaintiff retained legal counsel, Stanley Hilton, Esq., and requested an administrative hearing before an ALJ. (R. at 102). Plaintiff testified under oath at a hearing on October 27, 2011. (R. at 37-42). Plaintiff's counsel was present and a neutral vocational expert, Dr. Fred Monaco, Ph.D.,[2] gave testimony. (R. at 39, 69-77).

In a decision dated October 28, 2011, the ALJ denied Plaintiff's claims for DIB and SSI benefits. (R. at 24-32). On November 10, 2011, Plaintiff requested review of the ALJ's decision by the Appeals Council but was denied on April 26, 2013, making the ALJ's decision the final decision of the Commissioner. (R. at 1-4, 18). Plaintiff filed her Complaint in this Court on June 7, 2013. (Docket No. 3). Defendant filed an Answer on August 16, 2013. (Docket No. 5). On September 13, 2013, Plaintiff filed a Motion for Summary Judgment and a Brief in Support. (Docket Nos. 8, 9). Defendant then filed a Motion for Summary Judgment and a Brief in Support on November 4, 2013. (Docket Nos. 12, 13). This matter has been fully briefed and is ripe for disposition.

---

[2]     Dr. Monaco's qualifications include twenty years of experience as a vocational expert for the Social Security Administration and thirty years of experience with the Pittsburgh Board of Education as a special needs job placement coordinator and Administrative Director. (R. at 134).

### III. STATEMENT OF FACTS

A. <u>General Background</u>

Plaintiff was born on March 16, 1971, and was forty years of age[3] at the time of the hearing. (R. at 42). Plaintiff earned a GED but did not attend college or receive any vocational training. (R. at 45). Plaintiff has never married but has one child, who was seventeen years old at the time of the hearing, and two grandchildren. (R. at 43). She had custody of her one year old grandson. (*Id.*). Plaintiff subsisted on public assistance and received state health insurance benefits. (R. at 44).

Plaintiff explained that she wakes between the hours of 7:00 and 8:00 a.m., and goes to sleep around 8:30 p.m. (R. at 53). She has difficulty with her short-term memory and her ability to pay attention is contingent upon her level of interest. (R. at 60-61, 184). Her activities include reading books, watching movies with her grandson, doing laundry, and cooking, but she has difficulty cleaning due to back pain. (R. at 54-56, 181). Plaintiff testified to conflicts while working with others, but no loss of employment as a result. (R. at 61). She interacts with others twice per week. (R. at 183-184).

B. <u>Employment History</u>

Plaintiff was previously employed as a lamp assembler (a semi-skilled position with light exertion), a certified nurse aid (a semi-skilled position with very heavy exertion), and a cashier/food packer (unskilled position with medium exertion). (R. at 70). She was terminated from her most recent employment for giving a patient a shot of insulin. (R. at 273).

---

[3]      The SSA's regulations define "Younger Person" as a person who is less than 50 years of age. 20 C.F.R. §§ 404.1563, 416.963.

C.  Medical Treatment History

In Plaintiff's Disability Report filed with the SSA field office, Plaintiff listed the following mental and physical conditions as limiting her ability to work: depression, arthritis, and back pain.  (R. at 169).  During the hearing, Plaintiff also stated that she suffered from panic attacks, anxiety, and difficulty sleeping.  (R. at 49).  On appeal, Plaintiff only disputes the ALJ's decision with regard to her mental impairments.  Thus, the Court will only discuss the treatment history pertaining to her mental impairments.

Plaintiff was treated by a therapist[4] at the Staunton Clinic from June 12, 2008 to December 5, 2008.  (R. at 223-243).  Notes from Plaintiff's initial clinical evaluation indicate that Plaintiff suffered from anxiety and depression.  (R. at 229-230).  The clinic's mental status exam contained unremarkable findings, with Plaintiff exhibiting a well groomed appearance, normal activity, a cooperative attitude, an appropriate affect, and good insight and judgment.  (R. at 231-233).  Plaintiff initially received a Global Assessment of Functioning[5] ("GAF") score of 60[6] and subsequent scores of 65[7] and 60.  (R. at 232-233, 236, 242).  Plaintiff was prescribed medication and therapy, and on December 5, 2008 a psychiatrist[8] concluded that further psychiatric evaluation was not necessary.  (R. at 233, 235).  She was also treated at Tri-State

---

[4]    The Court notes that Plaintiff's 2008 treatment records from the Staunton Clinic are signed with an illegible signature over the line "therapist signature."  (R.at 234).  The record contains no mention of who signed these notes.

[5]    Global Assessment of Functioning is a numeric score ranging from 0 to 100 reported on Axis V of the Multiaxial Assessment.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32-33 (4th ed. 2000).  The "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning.  This information is useful in planning treatment and measuring its impact, and in predicting outcome."  *Id.*

[6]    A GAF score in the range of 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  *Id.* at 32.

[7]    A GAF score in the range of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

[8]    The Court notes that Plaintiff's 2008 psychiatric treatment level of care review from the Staunton Clinic is signed with an illegible signature over the line "Psychiatrist Signature."  (R. at 235).  This signature is markedly different than that of the therapist who signed the notes from this same period of treatment and the record contains no mention of who signed this review.  (*Id.*).

Medical Group Inc. by Jarod Stragang, D.O., on three occasions during 2010, complaining of anxiety and depression.   (R. at 263-267, 307).

Consulting Psychologist T. David Newman, Ph.D., prepared a clinical psychological disability evaluation of Plaintiff for the Pennsylvania Bureau of Disability Determination on August 4, 2010.   (R. at 273).   Dr. Newman observed no history of psychiatric inpatient hospitalization or outpatient mental health treatment.   (*Id.*).   Plaintiff demonstrated a mood within normal limits, she was cooperative, alert, aware of her surroundings, articulate, and rational, and Dr. Newman reported that he had no difficulty in establishing a working rapport with Plaintiff.   (R. at 273-274).   Further, Plaintiff's abstract thinking, concept formation, concentration, and orientation were intact.   (*Id.*).   Dr. Newman noted, however, that Plaintiff had gaps in her general knowledge as well as defects in her ability to recall recent events.   (*Id.*).   Plaintiff's capacity for social judgment was sufficient for recognizing appropriate behavior in social situations.   (*Id.*).   Dr. Newman diagnosed Plaintiff as suffering from a pain disorder associated with psychological factors and a general medical condition, but observed that Plaintiff appeared to be getting some benefit from taking antidepressants.   Dr. Newman opined that Plaintiff's "dysphoric[9] or depressed mood is likely related to physical discomfort and her mood state is considered to be dependent upon the level of her discomfort on any given day."   (*Id.*).   Plaintiff's abilities to understand, remember, carry out instructions, and respond appropriately to work pressures and social situations were not affected by her pain or psychological conditions. (*Id.*).

A state psychological consultant, Douglas Schiller, Ph.D., completed a Psychiatric Review Technique of the pertinent evidence on August 8, 2010.   (R. at 278).   The findings of

---

[9]     Dysphoria is defined as "[a] long lasting mood disorder marked by depression and unrest without apparent cause; a mood of general dissatisfaction, restlessness, anxiety, discomfort, and unhappiness."   Taber's Cyclopedic Medication Dictionary  652 (20th ed. 2005).

that review were unremarkable. (R. at 278-288). Dr. Schiller concluded that Plaintiff's major depressive disorder and anxiety were not severe and that Plaintiff had only mild limitations. (*Id.*).

Plaintiff resumed treatment at the Staunton Clinic on January 12, 2011, two years after her last visit. (R. at 338). A registered nurse completed an adult clinical evaluation and Plaintiff was assigned a GAF score of 45[10]. (R. at 341). Notes from that evaluation indicate that Plaintiff's highest GAF in the past year was recorded as 45-50. (*Id.*).

On February 16, 2011, G.C. Huang, M.D., completed a psychiatric evaluation of Plaintiff at the Staunton Clinic. (R. at 332). Plaintiff was diagnosed with depressive and anxiety disorders. (R. at 336). Further, Dr. Huang diagnosed Plaintiff with the following social stressors: "problems with primary support group" and "other psychological or environmental problems." (*Id.*). Dr. Huang assessed Plaintiff with a GAF score of 35-40[11]. (*Id.*). Plaintiff's highest GAF score in the past year was recorded by Dr. Huang as 45. (*Id.*). A mental status examination from that visit indicates that Plaintiff's appearance was appropriate, she was cooperative, and demonstrated normal psychomotor activity, normal range of affect, dysphoric mood, and normal impulse control. (R. at 335). These findings are congruous with Dr. Huang's subsequent treatment notes on Plaintiff's mental status. (R. at 329-343).

Plaintiff visited Dr. Huang on three more occasions prior to the completion of Dr. Huang's report. (*Id.*). Dr. Huang's notes from April 4, 2011 indicate that Plaintiff's mood and anxiety had improved after the increased dosage of her medication. (R. at 331). Plaintiff's

---

[10]     A GAF score of 41-50 indicates "[s]erious symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, OR school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV-TR, at 32.
[11]     A GAF score of 31-40 indicates "[s]ome impairments in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairments in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

sleeping had improved with the use of Trazodone[12] and Dr. Huang recommended an increased dosage of the drug as well as a return visit in three months. (*Id.*). During her visit on July 13, 2011, Plaintiff complained of pain affecting her mood. Dr. Huang prescribed an increase in medication and recommended a return visit in three months. (R. at 330). Finally, on September 7, 2011, Dr. Huang prescribed Prazosin[13] to treat Plaintiff's nightmares and recommended a return visit in two months. (R. at 329).

On September 28, 2011, after four visits with Plaintiff, each lasting fifteen minutes, Dr. Huang completed a medical assessment of Plaintiff's ability to perform work-related activities. (R. at 326). This report consisted of a form displaying a range of assessments of potential limitations in carrying out work related tasks and interacting with others. (*Id.*). The possible ratings[14] were none, slight, moderate, marked, and extreme. (*Id.*). The form stated in bold text that the assessment must be based upon objective medical evidence. (*Id.*). Dr. Huang assessed Plaintiff as having a slight limitation in her ability to understand, remember, and carry out simple instructions. (R. at 327). Plaintiff was assessed a moderate limitation in her ability to understand, remember, carry out, and make judgments regarding detailed instructions. (*Id.*). Dr. Huang related these limitations to Plaintiff's anxiety. (*Id.*). Plaintiff was also assessed with a marked limitation in categories relating to her ability to interact with others and respond to pressures appropriately at work. (*Id.*). Again, Dr. Huang related these limitations to Plaintiff's

---

[12] "Trazodone belongs to the group of medicines known as antidepressants or 'mood elevators.' It is used to relieve mental depression, and depression that sometimes occurs with anxiety." Mayoclinic.com, Trazodone, *available at* http://www.mayoclinic.com/health/drug-information/DR601375 (last visited December 6, 2013).

[13] "Prazosin belongs to the general class of medicines called antihypertensives. It works by relaxing the blood vessels so that blood passes through them more easily." Mayoclinic.com, Prazosin, *available at* http://www.mayoclinic.com/health/drug-information/DR601149 (last visited December 6, 2013).

[14] Dr. Huang's report defines the ratings as follows: "None" means "[a]bsent or minimal limitations. If limitations are present they are transient and/or expectable reactions to psychological stresses;" "Slight" means "[a]bsent or minimal limitations. If limitations are present they are transient and/or expectable reactions to psychological stresses;" "Moderate" means "[t]here is moderate limitation in the area, but the individual is still able to function well;" "Marked" means "[t]here is serious limitation in this area. The ability to function is severely limited but not precluded;" "Extreme" means "[t]here is major limitation in this area, There is no useful ability to function in this area." (R. at 326).

anxiety and ability to relate with others; however, Dr. Huang opined that Plaintiff was able to manage benefits in her own best interest.[15] (R. at 327-328).

### D. Administrative Hearing

At the hearing on October 27, 2011, Plaintiff testified that she had not worked since November of 2010 and was unable to work after that date due to arthritis, depression, panic attacks, anxiety, and trouble sleeping. (R. at 49). Plaintiff explained that she suffered from arthritis in her back which caused swelling in her hips and legs, making it difficult for her to "sit, stand, lay, or walk for a long period of time." (*Id.*). She was prescribed Prazosin to treat high blood pressure and nightmares but stated that the drug had not been entirely effective in treating her nightmares. (R. at 51).

Plaintiff explained that she was no longer seeing Dr. Ehrenberg and that her primary care physician at the time of the hearing was Dr. Damazo. (R. at 52). She stated that Dr. Damazo had suggested physical therapy to treat her condition but Plaintiff's previous attempts at physical therapy only worsened her condition. (*Id.*). Plaintiff alleged that the pain in her hips and legs was constant except for when she was sitting down, which lessened her pain, and that she tried to walk as much as possible but her legs would begin to swell after an unspecified amount of time. (*Id.*).

Plaintiff testified that her typical day began between the hours of 7:00 and 8:00 a.m. and consisted of the following: eating breakfast, playing with her grandson, taking a nap, taking a walk before dinner, and giving her grandson a bath before retiring around 7:30 or 8:30 p.m.. (R. at 54). She stated that she was kept awake for half the night because of her "back and stuff, and

---

[15] Plaintiff visited Dr. Huang on four more occasions after the ALJ's decision. (R. at 348-351). Because these records were not before the ALJ, they are not discussed in this opinion. *See Matthews v. Apfel*, 239 F.3d 589, 591 (3d Cir. 2001) (explaining that the District Court's review is limited to the evidence which was actually before the ALJ).

the nightmares," which her new medications were not helping. (*Id.*). Plaintiff testified that her hobby was reading books and that she watched movies with her grandson. (R. at 54-55). She did not attend any social functions or religious services. (*Id.*).

Plaintiff stated that she washed her laundry at the home of a friend. (R. at 56). She explained that she was not limited in her ability to cook meals, but had a difficult time with vacuuming and scrubbing due to pain when bending over. (R. at 56-57). Plaintiff further testified that she can only lift a gallon of milk and that she required the assistance of her mother when shopping because of difficulty lifting bags of groceries. (R. at 57).

Plaintiff advised that she could sit for ten to fifteen minutes and could stand for ten minutes before experiencing pain. (R. at 58). The ALJ then acknowledged that Plaintiff was using a cane at the hearing and Plaintiff responded that she had been using it for one year to help her balance when outside of her house. (*Id.*). Plaintiff asserted that she could not walk without the cane unless she was holding onto something and that she had fallen on more than one occasion. (R. at 59). The ALJ then asked Plaintiff about her previous testimony that she routinely took her grandson for a walk during the day. (*Id.*). Plaintiff responded that she held onto her grandson's stroller during these walks instead of using her cane. (*Id.*). She added that she could walk about half a block at a time, after which she had to sit down to rest. (R. at 59-60).

As to any memory difficulties, Plaintiff testified that she struggled to remember information such as what she had to eat three or four days ago and what was being discussed five minutes ago during the hearing. (R. at 60-61). Plaintiff admitted, however, that she still possessed some long-term memories from her childhood. (R. at 61).

Plaintiff did not identify any significant inability to get along with others. (*Id.*). She described herself as a "leader type" who was "not a very good follower," and stated that she had

been in conflicts with others as a result of these personality traits; nonetheless, she conceded that she had never lost a job because of these conflicts. (*Id.*). She alleged that her difficulties with focus and concentration caused her to read at much slower pace than she had in the past and that she had been reading the same book for three months. (R. at 62). She also told the ALJ that her depression limited her functioning in the workplace because she experienced spontaneous episodes of crying and panic attacks. (*Id.*).

Plaintiff's counsel then questioned Plaintiff regarding her panic attacks and crying spells. (R. at 63-64). Plaintiff testified that: she could not breathe during the panic attacks; they occurred four to five times per week; the attacks could last from ten to thirty minutes; and she had one recently but could not remember the exact day. (R. at 63). Plaintiff then stated that she was treated for depression by Dr. Huang at the Staunton Clinic every two months. (*Id.*). She had crying spells lasting between fifteen and thirty minutes "more than a few times a week," and her nightmares were typically centered on her deceased brother. (R. at 64-66). She added that she was able to cope with her mental and physical disabilities with assistance from a close friend who lives next door. (R. at 66). Plaintiff concluded her testimony by stating that she was easily stressed out. (*Id.*).

Vocational Expert, Dr. Fred Monaco, then gave testimony under oath. (R. at 69). Dr. Monaco asked Plaintiff whether she had been certified as a nurse's aide, to which Plaintiff responded in the affirmative. (*Id.*). Dr. Monaco then testified that Plaintiff previously worked as a lamp assembler, her skill level was semi-skilled and the exertion level was light.[16] (*Id.*). Plaintiff's work as a nurse's aide was semi-skilled at a very heavy exertion level.[17] (*Id.*). Dr.

---

[16] Dr. Monaco testified that "the claimant was in - - doing lamp assembly. That would be semi-skilled, SVP 3, light exertion level, 706.687-010." (R. at 70).

[17] Dr. Monaco noted that "there were four separate positions as a certificated nurse's aide, that would be semi-skilled, SVP 3, at very heavy exertion level, 355.367-014." (R. at 70).

Monaco acknowledged that Plaintiff's work history as a cashier and a food packer was absent from the record, and classified both positions as unskilled with a medium exertion level.[18] (*Id.*).

The ALJ proceeded to posit three hypotheticals for Dr. Monaco. (R. at 70). First, the ALJ told Dr. Monaco to consider an individual with the same age, education, and work experience as Plaintiff. (R. at 70-71). The ALJ then asked Dr. Monaco whether such an individual, who was also limited to lifting twenty-five pounds frequently and occasionally, occasional bending, occasional kneeling, occasional stooping, occasional crouching, occasional balancing, and occasional climbing, could perform the jobs that Plaintiff had previously held. (*Id.*). Dr. Monaco answered that the hypothetical individual could perform the job of lamp assembly. (*Id.*). Further, Dr. Monaco testified that there would be additional suitable jobs in the national economy, including: "bench assembly," with approximately 76,000 positions in the national economy, "cutters, solderers, and raisers," with approximately 84,000 positions in the national economy, and "abrasive and extruding machine operators," with approximately 57,000 light positions in the national economy. (*Id.*).

In his second hypothetical, the ALJ described an individual limited to the following: occasionally lifting twenty pounds and frequently lifting ten pounds, standing and walking four hours in an eight-hour workday, sitting for eight hours a day but with the option of some standing, pushing and pulling twenty pounds, occasional bending, kneeling, stooping, crouching, balancing, and climbing, and no work at unprotected heights or around dangerous machinery. (R. at 72). Dr. Monaco responded that such an individual could perform the job of lamp assembly as well as all of the additional jobs listed in his answer to the first hypothetical. (*Id.*).

The ALJ's third hypothetical depicted an individual with the same limitations described

---

[18]     Dr. Monaco classified Plaintiff's work as a cashier as "unskilled, medium, 211.462-014." (R. at 70). Plaintiff's past work as a food packer was classified as "unskilled, medium exertion level, 920.587-018." (*Id.*).

in Dr. Huang's report dated September 28, 2011.  (R. at 72-73, 326-328).  The ALJ posited an individual with moderate limitations in the ability to understand, remember, and carry out detailed instructions, as well as a moderate limitation in the ability to make simple decisions at work.  (R. at 72-73).  Additionally, the ALJ described the individual as possessing a marked limitation in the ability to interact appropriately with the public, supervisors, and co-workers. (*Id.*).  Finally, the individual was described as having a marked limitation in the ability to respond appropriately to work pressures in a typical setting and in the ability to respond appropriately to changes in such a setting.  (R. at 73).  Dr. Monaco concluded there were no jobs in the national economy for an individual with such limitation.  (*Id.*).

Plaintiff's attorney then made several inquiries of Dr. Monaco.  (R. at 74).  He first asked whether an employer would tolerate an employee who was chronically off task ten to fifteen percent of a workday, to which Dr. Monaco responded in the negative.  (*Id.*).  Plaintiff's attorney next questioned Dr. Monaco whether and to what extent an employer generally allows for time off task apart from scheduled breaks.  (*Id.*).  Dr. Monaco answered that all jobs have instances of downtime but that employers generally expect employees to perform an hour of work in exchange for an hour's pay.  (*Id.*).  Dr. Monaco responded in the negative when asked whether an employer would tolerate an employee who was chronically absent from work two or more times per month.  (*Id.*).  Finally, Plaintiff's attorney questioned Dr. Monaco regarding the amount of employee absenteeism that employers allow and Dr. Monaco responded that six to twelve days per year is the allowable range.  (*Id.*).

IV.    STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[19], 1383(c)(3)[20]; *Schaudeck v.*

---

[19]     Section 405(g) provides in pertinent part:
         Any individual, after any final decision of the [Commissioner] made after a hearing to which he
         was a party, irrespective of the amount in controversy, may obtain a review of such decision by a
         civil action ... brought in the district court of the United States for the judicial district in which the
         plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).
[20]     Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190–91 (3d. Cir. 1986).

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

## V.    DISCUSSION

The ALJ denied Plaintiff both DIB and SSI benefits.  (R. at 32).  The ALJ performed all five steps of the sequential evaluation process in evaluating Plaintiff's alleged physical impairments, and performed the first two steps in evaluating Plaintiff's alleged mental impairments.  (R at 26-32).  At Step 1, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2014.  (R. at 26).  Further, the ALJ determined that Plaintiff had not engaged in substantial gainful activity ("SGA") since Plaintiff's amended alleged onset date of November 1, 2010.  (*Id.*).  At Step 2, the ALJ held that Plaintiff had the following severe impairments:  mechanical low back pain and fibromyalgia.  (*Id.*).  The ALJ concluded, however, that Plaintiff's alleged mental impairments – severe depression, anxiety, and panic attacks – did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities and were, therefore, non-severe.  (*Id.*).

In evaluating the severity of the aforementioned mental impairments, the ALJ considered four broad functional areas as set out in 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(1)-(4): daily living[21], social functioning[22], concentration[23], and decompensation[24].  (R. at 27).  In the functional area of daily living, the ALJ found that Plaintiff had no limitations.  (*Id.*).  The ALJ noted that Plaintiff testified that she is able to cook, clean, and provide care for

---

[21]    "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(1).

[22]    "Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers."  20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(2).

[23]    "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(3)

[24]    "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(4)

her grandson. (*Id.*). Based upon Plaintiff's testimony, the ALJ attributed her daily living limitations to Plaintiff's physical impairments. (*Id.*). In the area of social functioning, the ALJ found that Plaintiff had some mild limitation resulting from her alleged difficulty getting along with other people. (R. at 28). The ALJ noted, however, that Plaintiff's mental and psychiatric evaluations do not demonstrate more than a mild limitation in these areas and that notes from those examinations consistently evidence "good eye contact, and appropriate and effective communication." (*Id.*). In the functional area of concentration, the ALJ found that Plaintiff had a mild limitation but that her evaluations and testimony reflected some ability to concentrate. (*Id.*). Further, the ALJ concluded that Plaintiff had experienced no extended episodes of decompensation. (*Id.*). Having determined that Plaintiff's mental limitations were no more than mild in the first three functional areas, and that there were no extended episodes of decompensation in the fourth functional area, the ALJ concluded that Plaintiff's alleged mental impairments were not severe[25]. (*Id.*).

The ALJ held that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.04 (Disorders of the Spine), because the record did not contain sufficient evidence of the criteria provided in the regulation. (R. at 28). The ALJ then explained that Plaintiff's fibromyalgia did not meet the criteria of any listing but evaluated it under 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 14.09 (Inflammatory Arthritis), and found that it did not meet the criteria of that listing. (R. at 29).

The ALJ assessed Plaintiff with the following residual functional capacity:

---

[25] "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

> [C]laimant has the residual functional capacity to perform light work as defined in 20 C. F. R. § 404.1567(b) and 416.967(b) except she is limited to lifting 20 pounds frequently or 10 pounds occasionally; would be limited to standing and walking four hours of an 8-hour work day; could sit for 8 hours, but would need the option of some standing at her option; would be limited to 20 pounds weight limit for pushing and pulling; no more than occasional bending, kneeling, stooping, crouching, balancing or climbing; and could not work at unprotected heights or dangerous machinery.

(R. at 29.). Finally, the ALJ concluded that Plaintiff had not been disabled under the Act from the amended alleged disability onset date of November 1, 2010 to the date of his decision on October 28, 2011. (R. at 32).

On appeal, Plaintiff argues that the ALJ's conclusion at Step 2 that Plaintiff's anxiety, depression, and panic attacks were non-severe is not supported by substantial evidence. (Docket No. 9, at). In support of her objection to the ALJ's decision, Plaintiff offers several arguments which the Court will address, in turn. Plaintiff argues that the ALJ: (1) erred in finding that Plaintiff's alleged mental impairments were not severe at Step 2 of the sequential analysis; (2) erred in reaching conclusions which were contrary to the report and treatment records of Dr. Huang; (3) incorrectly granted greater weight to the opinions of Dr. Schiller and Dr. Newman, which were completed prior to Plaintiff's amended alleged onset disability date; (4) and adopted a flawed hypothetical which did not incorporate Plaintiff's alleged mental impairments into her residual functional capacity. (*Id.*). Defendant counters that the ALJ's decision to deny Plaintiff DIB and SSI benefits is supported by substantial evidence and that the ALJ's decision should be affirmed. (Docket No. 13). Having fully considered the entirety of the administrative record and the positions of the parties, the Court agrees with Defendant that the ALJ's decision is supported by substantial evidence and affirmance of the ALJ's opinion is warranted.

### A. The ALJ's Finding at Step 2

As this Court recently held in *Niglio v. Colvin*, Civ. A. No. 12-1583, 2013 WL 2896875, at *8 (W.D. Pa. June 13, 2013), the ALJ's analysis at Step 2 to determine whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." *Magwood v. Comm'r of Soc. Sec.*, 417 F. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). Step 2 merely serves a minimal gate-keeping function, and Plaintiff's burden to demonstrate a severe impairment is not an exacting one. *McCrea v. Comm'r of Soc. Sec.*, 370 F. 3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85-28, 1985 WL 56856 at *3). Reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant at Step 2. *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003)). Further, the use of Step 2 as a vehicle for the denial of benefits should, "raise a judicial eyebrow," and deserves "close scrutiny." *McCrea*, 370 F. 3d at 360-361. However, if the ALJ does not deny benefits at Step 2, but instead proceeds to analyze the claims under the remaining steps, a remand is not generally warranted due to the ALJ's failure to describe an alleged impairment as "severe" at Step 2, unless such error undermines the ALJ's analysis of the remaining steps and/or the ultimate disability determination. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)); *see also Niglio*, 2013 WL 2896875, at *8.

Noting that Step 2 is a *de minimis* screening process for meritless claims, Plaintiff argues that the ALJ's finding that Plaintiff's alleged mental impairments are non-severe was not supported by substantial evidence. (Docket No. 9 at 12-13). Specifically, Plaintiff argues that the ALJ's conclusions regarding Plaintiff's limitations in the four functional activities at Step 2

of the analysis are contrary to Plaintiff's testimony as well as Plaintiff's complaints to the Staunton Clinic and Dr. Huang. (*Id.*). Defendant counters that the ALJ's decision was supported by substantial evidence, and that the ALJ properly applied the four broad functional areas for the evaluation of mental disorders as set out in 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.00(C)(1)-(4) (stating that the following functional areas are to be assessed when evaluating a claimant's mental impairments: daily living, social functioning, concentration, and decompensation). (Docket No. 13 at 10-11). Further, Defendant maintains that the ALJ did not err by finding Plaintiff's alleged mental impairments to be non-severe at Step 2, because the ALJ duly continued the analysis through Step 5 in evaluating Plaintiff's physical impairments. (Docket No. 13 at 13).

Although the ALJ concluded that Plaintiff's alleged mental impairments were non-severe at Step 2, the Court notes that the ALJ was thorough in his discussion and proceeded through Step 5 before denying Plaintiff SSI and DIB. (R. at 24-32). When an ALJ finds an alleged impairment non-severe at Step 2 but proceeds to evaluate the remaining alleged impairments through Step 5, the level of scrutiny that would be required if the ALJ had merely concluded his evaluation at Step 2 is not warranted. *Niglio*, 2013 WL 2896875, at *8. Therefore, in the present case, this Court must only determine whether the ALJ provided substantial evidence to justify his decision denying benefits. *Id.*

Plaintiff's testimony before the ALJ does not compel a contrary result. Credibility determinations are in the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). The Court agrees with Defendant that the ALJ properly applied the four functional areas at Step 2 of the analysis. There is substantial evidence in the record to conclude that Plaintiff's anxiety and depression caused no more than a minimal limitation in any of these areas.

Moreover, there are inconsistencies between Plaintiff's subjective complaints and her testimony relating to her daily living, social functioning, and concentration. "Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about her limitations or symptoms is less than fully credible." *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 164 (3d Cir. 2008).

Substantial evidence supports the ALJ's finding that Plaintiff had no limitation in the functional area of daily living. The ALJ attributed any limitations in this area to physical impairments. (R. at 27). Although Plaintiff testified that she occasionally needed assistance from a friend and her mother, Plaintiff also admitted that she is able to take care of her grandson, take him for daily walks, cook, wash laundry, and do some cleaning. (R. at 27, 31, 54-57, 66-67). In addition, Plaintiff's adult clinical evaluation from the Staunton Clinic on January 12, 2011, confirms that Plaintiff was able to perform the activities of daily living without assistance. (R. at 339). Given such evidence, the ALJ did not err in finding that Plaintiff had no limitation in the area of daily living. *See Russo v. Astrue*, 421 F. App'x 184, 190 (3d Cir. 2011) (finding no error when the ALJ discredited testimony by the claimant which was inconsistent with her daily activities).

The ALJ's determination that Plaintiff had a mild limitation in the area of social functioning is likewise supported by substantial evidence. The area of social functioning consists of "the ability to get along, communicate clearly, and cooperate with others." *Parks v. Comm'r. of Soc. Sec.*, 401 F. App'x. 651, 654 (3d Cir. 2010). Here, Plaintiff was able to shop in stores and interacted with her grandson, her mother, and a friend. (R. at 28, 56-57). Although Plaintiff testified to difficulty getting along with others in a work environment, the ALJ noted that this was not evidenced in her psychiatric or mental status examinations. (R. at 28). The

ALJ observed that Plaintiff's mental status and psychiatric examinations consistently show good eye contact, and appropriate and effective communication. (*Id.*). Additionally, Dr. Newman and Dr. Huang both noted that Plaintiff exhibited appropriate behavior, had a logical thought process, and was able to communicate effectively. (R. at 273-276, 346-351). Plaintiff testified that she had never lost a job as a result of her alleged difficulty dealing with others. (R. at 61). *See Parks*, 401 F. App'x at 654. Accordingly, the ALJ did not err in finding only a mild limitation in this area.

With regard to concentration, the ALJ's finding of a mild limitation is also supported by substantial evidence. Plaintiff's mental status examination from the Staunton Clinic indicates that Plaintiff had some difficulty with subtraction but was able to make exact change and multiply single digits. (R. at 28, 274). Further, Plaintiff was able to read books for enjoyment and watch movies with her grandson. (R. at 28, 55). The Third Circuit has found that activities such as reading or watching television require a degree of concentration, persistence, or pace. *Parks*, 401 F. App'x at 655. Finally, there have been no reported episodes of decompensation. Therefore, this Court holds that the ALJ's conclusion at Step 2 of the analysis that Plaintiff's mental impairments are non-severe is supported by substantial evidence. *See Niglio*, 2013 WL 2896875, *8.

### B. The Opinion of Dr. Huang

Plaintiff next argues that the ALJ's conclusions are contrary to the report completed by Dr. Huang and that the ALJ's decision to grant little weight to that opinion is not in accord with the Act's regulations regarding the weight that should be given to the opinions of treating physicians. (Docket No. 9). Defendant responds that the ALJ properly discounted the weight

granted to Dr. Huang's report because Plaintiff's subjective complaints to Dr. Huang and the report itself are contrary to the totality of the evidence in the record. (Docket No. 13).

The Court agrees with Defendant that the ALJ reasonably declined to grant controlling weight to Dr. Huang's report. The ALJ noted that Dr. Huang's report was inconsistent with Plaintiff's sporadic pattern of treatment and unsupported by objective medical evidence. (R. at 27). In order for the opinions of treating physicians to be accorded more weight, the opinions must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and…not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). If an ALJ does not accord greater weight to the treating physician's opinion, the ALJ will apply the following factors to determine the proper weight to accord the opinion: length of treatment and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

Considering the length of treatment factor, the Court notes that Dr. Huang only examined Plaintiff four times prior to completing her report. (R. at 329-343). Each of these visits was fifteen minutes in duration and ranged between two and three months apart. (*Id.*). Further, the ALJ observed that Plaintiff had not sought mental health treatment for almost one year after her alleged onset date. (R. at 27). A treating physician's opinion which is consistent with the record evidence should be granted significant weight, especially when that opinion reflects the physician's expert judgment based upon a continuing observation of the patient over a prolonged period of time. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). In *Morris v. Barnhart*, 78 F.

App'x. 820, 823 (3d Cir. 2003), the Third Circuit found that the opinion of a psychiatrist who saw the claimant on only three or four occasions did not "reflect judgment based on continuing observation of the patient's condition over a prolonged time." *Id.* at 823. (internal citations omitted). In the instant case, the four visits that Plaintiff had with Dr. Huang prior to his completion of the report do not constitute observation over a prolonged time period.

As noted by the ALJ, Dr. Huang's report is a three page form with check-mark boxes and short fill-in-the-blank spaces. (R. at 27, 326-328). An ALJ may afford the opinion of a treating physician less weight depending on the extent to which supporting explanations are provided. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The ALJ noted that the report contained "no objective medical evidence to support [the] opinion." (R. at 27). The Court agrees that the explanations provided by Dr. Huang lack specificity and fail to adequately support the report's conclusions. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

Regarding the consistency factor, the ALJ observed that Dr. Huang's report is not consistent with the record as a whole. (R. at 27). The marked limitations noted therein are not supported by Dr. Huang's treatment notes[26] and were not observed in any other treatment records. Dr. Huang's treatment notes describe Plaintiff as suffering from depression, anxiety, nightmares, and fear of being alone, but Dr. Huang did not find that Plaintiff suffered from a limitation in her ability to interact with the public, supervisors, or co-workers. (R. at 329-345). To the contrary, Dr. Huang's treatment notes document that: Plaintiff did not suffer from delusion; she had an appropriate appearance; she had a normal rate of speech; she had a normal range of affect, impulse control, and psychomotor activity; she had no homicidal or suicidal

---

[26]  The record indicates that Dr. Huang saw Plaintiff and completed treatment notes on the following dates prior to completion of the report: February 16, 2011, April 4, 2011, July 13, 2011, and September 7, 2011. Each of these visits lasted fifteen minutes. (R. at 329-345).

ideation; she had fair judgment and insight; and she had a linear/goal-directed thought process. (R. at 329-343). Moreover, treatment notes from September 7, 2011, the visit prior to the completion of Dr. Huang's report, state that Plaintiff was suffering from family related stress at the time but "is coping appropriately." (R. at 329). Further, the ALJ observed that records from Plaintiff's primary care physician indicate that despite her anxiety and depression Plaintiff was doing well on her medication. (R. at 27, 268-269).

It is clear from the record that Plaintiff suffers from depression and anxiety. (R. at 273-276, 283). The record does not, however, support Plaintiff's argument that these mental impairments are severe. A diagnosis alone is not sufficient to demonstrate disability. *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009). Plaintiff received minimal treatment from Dr. Huang, the limitations described in her report are not consistent with the record, and the report itself is not corroborated by objective evidence. Accordingly, the Court holds that the ALJ's decision to grant little weight to the report of Dr. Huang is supported by substantial evidence. *See Brown*, 649 F.3d at 196.

### C. The Opinions of Dr. Schiller and Dr. Newman

Plaintiff also argues that because the conclusions of Dr. Schiller and Dr. Newman were reached prior to the amended alleged disability onset date of November 1, 2010, the ALJ's decision that Plaintiff's mental impairments cause only mild limitations is not supported by substantial evidence. (Docket No. 9 at 13). Defendant counters that because the reports of Dr. Schiller and Dr. Newman were consistent with the record as a whole, the ALJ reasonably relied upon them, despite the fact that the reports were authored approximately three months prior to Plaintiff's amended disability onset date. (Docket No. 13 at 12).

Although the reports of Dr. Schiller and Dr. Newman were completed prior to Plaintiff's amended alleged disability onset date, "[t]he Social Security Regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Updated reports are required only if there is new medical evidence which in the opinion of the ALJ may change the findings of the consultative examiner. *Id.* (citing S.S.R. 96-6P, 1996 WL 374180, at *3-4). Moreover, as discussed above, the Court believes that the ALJ appropriately concluded that the report by Dr. Huang was inconsistent with the record and not supported by objective medical evidence. (R. at 27). The ALJ properly found that the reports of Dr. Schiller and Dr. Newman were consistent with the record. (*Id.*). Accordingly, the ALJ did not err in relying on the consultative examiners' reports rather than the later completed report by Dr. Huang. *See Chandler*, 667 F.3d at 356.

### D.  The ALJ's Hypotheticals

Finally, Plaintiff argues that the vocational expert's testimony cannot be relied upon as substantial evidence because Plaintiff's alleged impairments and limitations were not incorporated into the hypothetical adopted by the ALJ as Plaintiff's Residual Functional Capacity. (Docket No. 9 at 15). The Court finds that this argument lacks merit. When creating hypotheticals, an ALJ is not required to include limitations which are not credibly established or which are in conflict with the medical record. *Lynn v. Colvin*, 2013 WL 3854460, *14 (W.D. Pa. July 24, 2013) (citing *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005). The ALJ reasonably concluded that Dr. Huang's opinion was not supported by objective medical evidence. (R. at 27). Moreover, the brief conclusions therein are not congruent with the record as a whole; none of the physicians that examined Plaintiff or any other evidence in the record

noted the alleged limitations.  Therefore, the ALJ's decision to posit two hypotheticals which omitted Plaintiff's alleged impairments was supported by substantial evidence.

## VI.    CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record.  Reversal or remand of the ALJ's decision is not appropriate.  Accordingly, Plaintiff's Motion for Summary Judgment [8] is denied, Defendant's Motion for Summary Judgment [12] is granted, and the decision of the ALJ is affirmed.  Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated:  December 11, 2013

cc/ecf:  All counsel of record.